UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| JEANNIE C. MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:12CV26 TIA |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court under 42 U.S.C. § 405(g) for judicial review of the denial of Plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act. The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## I. Procedural History

On February 22, 2008, Plaintiff filed an application for Disability Insurance Benefits, alleging that she became unable to work on August 17, 2007 due to back injuries, hypothyroidism, type II diabetes, A/V block, SVT, headaches, and anxiety. (Tr. 11, 66, 112-20) The application was denied on June 6, 2008, after which Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 61, 66-70, 73) On February 22, 2010, Plaintiff testified at a hearing before the ALJ. (Tr. 24-54) In a decision dated April 29, 2010, the ALJ found that Plaintiff had not been under a disability from August 17, 2007 through the date of the decision. (Tr. 11-23) The Appeals Council denied Plaintiff's request for review on January 19,

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this action.

2012. (Tr. 1-3) Thus, the decision of the Appeals Council stands as the final decision of the Commissioner.

## **II. Evidence Before the ALJ**

At the hearing before the ALJ, Plaintiff was represented by counsel. The ALJ first questioned Plaintiff, who testified that she was born on August 31, 1972 and had a GED. She was married with three children, ages 18, 16, and 14. Plaintiff's husband was a laborer. (Tr. 25-30)

Plaintiff further testified that she previously worked for Mid-America Resorts as a telemarketer on a part-time basis. She left that job because her family moved. In addition, Plaintiff worked for a daycare and learning center, caring for infants. She worked full-time for six months and quit because it hurt her back to hold the kids. Plaintiff then worked for Brown Shoe placing orders. She described her duties as taking an order form and cart, then loading the cart with shoe orders. The job required reaching to get the shoe boxes, and she lifted between 15 and 50 pounds. Plaintiff stopped working after a motor vehicle accident and had not worked since. (Tr. 30-32)

Plaintiff stated that she was unable to work due to back pain, neck pain, anxiety, panic attacks, thyroid issues, and extreme headaches. Her low back pain was the worst, and it radiated down her legs to her feet, causing her feet to go numb. She experienced this pain twice a week, and it lasted from a few hours to all day. With regard to neck pain, Plaintiff testified that the constant pain was everyday and went from her neck to shoulders. Dr. Shettinger ran several tests, but Plaintiff had not scheduled surgery because she was scared. Previous surgeries included heart surgery for a pacemaker, a hysterectomy, and an appendectomy. Plaintiff stated that her doctor

2

indicated surgery could relieve some pain but would lessen her neck and back ability. Plaintiff took ibuprofen and Tylenol for pain. She took Vicodin in the past but did not want to get addicted. She last took a muscle relaxant three weeks prior to the hearing. (Tr. 32-35)

Plaintiff described her panic attacks as feeling like an elephant was on her chest. She would sweat, shake, and feel nauseous. She experienced these attacks for years, but they worsened after her accident. She felt anxious whenever she got into a car or went to Wal-Mart or social gatherings. She took Zoloft for the panic attacks, which lasted from a half hour to a couple hours. Plaintiff felt exhausted after an attack. The attacks came suddenly and were triggered by being around too many people. Plaintiff had never seen a psychiatrist. (Tr. 35-37)

Plaintiff also testified regarding thyroid problems, which were controlled with medication. However, Plaintiff continued to have muscle pain all over her body, as well as fatigue. Plaintiff was planning to see a specialist because the doctors were unsure if her pain and fatigue were due to the medication or her thyroid. Plaintiff also had headaches every day and severe headaches once a week. When her headache was severe, she needed to lay in her dark bedroom with a cold compress on the back of her neck for a couple hours. Nothing triggered the headaches, and she took ibuprofen for relief. She had not been to the ER for headaches. (Tr. 37-38)

Plaintiff stated she could occasionally lift and carry 5 to 10 pounds. Some days she could lift a gallon milk without pain, but other days she had pain going down her back when lifting that weight. Her kids went to the store with her and lifted 10 pound bags of potatoes. Plaintiff could stand for a half hour but might feel pain later. She could walk through Wal-Mart, but sometimes she went to the car while her children finished shopping. She estimated that she walked 20 to 30

3

minutes during short trips and 45 minutes during longer trips. Plaintiff could sit 15 to 20 minutes before needing to move around. (Tr. 38-40)

On a typical day, Plaintiff got up with her children and sent them to school. She started a load of laundry and did a few dishes. She took a nap for about and hour and a half in the afternoon. Plaintiff then made dinner with the help of her kids. Her daughter helped clean the kitchen. Plaintiff made the beds and straightened up; however, she could no longer vacuum. She enjoyed putting pictures in photo albums. She did not belong to any churches or social organizations, and she did not often visit friends. (Tr. 40-41)

Plaintiff's attorney also questioned her regarding her ability to stand. She stated she could stand 30 minutes only if she leaned on something. If she did not have something to lean on, she could only stand for 10 or 15 minutes. Standing put too much pressure on her back and caused pain down her legs. When Plaintiff sat for 15 to 20 minutes, she sat in a recliner with her legs propped up. Leaning back and propping her legs relieved pressure in her back. Plaintiff further testified that she feared being in public with too many people she did not know. She had a panic attack on the way to court and had to stop the car several times to stretch. Her panic attack caused her to sweat all over and caused her heart to race. She was very nervous. Plaintiff experienced similar attacks once a week, usually when she was out in public. (Tr. 41-44)

Plaintiff thought she could walk the length of a football field on a good day. On a bad day, she could only walk half of the field. However, she experienced pain that went down her back and into her legs and feet. Her feet also went numb and tingling when she walked. In addition, Plaintiff experienced tingling in her hands five or six times a month. Her hands swelled

4

and went numb. During these episodes, Plaintiff had problems doing dishes and picking up things around the house. (Tr. 44-46)

A vocational expert ("VE"), Darrell Taylor, also testified at the hearing. The VE stated that Plaintiff's past work consisted of order filler in the shoe industry, which was unskilled work at medium exertion; telemarketer, which was sedentary and semi-skilled; and childcare worker, which was medium and unskilled. The ALJ then asked the VE to assume a younger individual with a GED and the past work history the VE identified. The person could perform sedentary work, which involved lifting and carrying 10 pounds occasionally; standing and walking two hours in an eight hour workday; and sitting six out of eight hours. In addition, the individual needed to change positions for a few minutes every hour. She could not climb ladders, ropes, or scaffolds but could occasionally stoop, crouch, kneel, and crawl. She was limited to simple, routine tasks with no direct interaction with the general public. Given this hypothetical, the VE testified that the individual could perform work as a hand packer or production worker/assembler. These unskilled positions allow a 15-minute break in the morning and afternoon, as well as a 30 to 45 minute lunch break. They did not allow unscheduled breaks.
However, if the ALJ changed to hypothetical to include sitting 15 to 20 minutes at a time and standing 30 minutes at a time, the VE stated the person would be unable to maintain work-related activities. (Tr. 47-52)

In a Disability Report – Adult, Plaintiff reported that her thyroid disease and diabetes made her exhausted and unable to do anything physical. Her headaches caused blurred vision and nausea, and she was unable to focus on tasks or plan activities. Her back injury rendered her unable to lift, reach, or push/pull. Further, extended periods of walking, sitting, and standing

5

caused pain in her back, neck, shoulders, and legs. At times, it hurt to stand, sit, walk, move quickly, or change positions. Her supraventricular tachycardia ("SVT") was controlled by medication and produced no side effects. (Tr. 138, 140, 163)

Plaintiff also completed a Missouri Supplemental Questionnaire and reported that she had a back and neck injury and a thyroid disease, which caused pain in her back and neck; extreme fatigue; weakness in her shoulders, arms, and legs; severe headaches; and nausea. Walking, standing too long, sitting too long, picking up objects, and pushing/pulling made her symptoms worse. Plaintiff lived at home with her husband and three children. She took care of her children by coordinating daily activities and manage the household. She was able to do laundry, wash dishes, make beds, vacuum/sweep, and bank. She was unable to perform yard work. All activities caused pain in her back, neck, and shoulders. Plaintiff reported shopping once a week for an hour with help. Her family helped with the cooking. On an average day, she took medication; ate breakfast; did daily exercises; read or watched TV; did chores; ate lunch; took a nap; planned dinner; helped her kids with school work; took a short walk; showered; and went to bed. She needed to change positions and put pillows under her head and legs when reading or watching TV. She could play on the computer for 15 to 20 minutes and could drive to the grocery store or school. Plaintiff had no problems following instructions or getting along with others. (Tr. 141-48)

### III.  Medical Evidence

On January 23, 2007, Plaintiff underwent implantation of permanent dual-chamber pacemaker to treat type II second degree AV heart block and syncopal episodes since age 13. She underwent the procedure without complication. (Tr. 218-24)

On August 21, 2007, Plaintiff reported shortness of breath and pain over chest wall secondary to a sternal fracture after a motor vehicle accident. Plaintiff denied any significant pain, but Naganna Channaveeraiah, M.D., noted that palpation of the sternum was very painful. Vertebral thoracic examination was benign. Dr. Channaveeraiah encouraged Plaintiff to rest in bed and perform breathing exercises. Plaintiff was to remain off work for at least the next six weeks and return in two weeks. (Tr. 278-9)

On August 24, 2007, Plaintiff reported neck and low back pain after a motor vehicle accident on August 17, 2007. George Schoedinger, III, M.D., conducted an orthopedic examination which revealed: moderate distress; laryngeal crepitus; posterior tenderness to palpation at base of cervical spine; tenderness in the mid and lower lumbar area and lower dorsal spine; tenderness to palpation at lumbosacral level in midline and to either side; slightly decreased range of motion of cervical spine; totally restricted extension; and decreased lateral bending to either side. Straight leg raising was possible to 90 degrees with the production of low back pain without lower limb symptoms. Plaintiff had full active and passive rant of motion of all joints in upper and lower limbs without pain or deformity. X-rays of Plaintiff's cervical and lumbar spine showed no evidence of fracture or dislocation, and the disc spaces were satisfactorily maintained. Symptoms suggested contusion of the cervical and lumbar spine in addition to aggravated degenerative cervical and lumbar disc disease. Dr. Schoedinger range of motion exercises and physical therapy for a home exercise program directed toward her cervical and lumbar spine. He also instructed Plaintiff to remain off work. (Tr. 178-81)

On December 7, 2007, Plaintiff complained of coughing, congestion, runny nose, and chest pain. Dr. Channaveeraiah assessed an upper respiratory infection and accute bronochitis. He noted that Plaintiff smoked. (Tr. 272)

On January 10, 2008, Plaintiff reported pain with any activity, pain radiating to her shoulder and arms, and weakness in her arms. Dr. Schoedinger noted decreased sensation to light touch over all autonomous sensory areas in bilateral hands. He noted no lower limb sensory loss, and no motor weakness, pathalogic reflex, or vascular insufficiency in either arm. Dr. Schoedinger referred Plaintiff for myelogram. He also instructed Plaintiff maintain as high a level of activity as possible and to remain off work. (Tr. 177)

The following day, Plaintiff reported experiencing headaches and neck pain resulting from a motor vehicle accident. She experienced no dizziness, nausea, vomiting, or photophobia. Dr. Channaveeraiah observed muscle spasms in back of neck and diagnosed cephalgia. (Tr. 228)

On February 1, 2008, Dr. Schoedinger told Plaintiff that she was scheduled for cervical and lumbar myelogram followed by a CT scan of the cervical and lumbar spine. Dr. Schoedinger opined that it was probable that Plaintiff had disc pathology at one or more levels in both the cervical and lumbar spine. If the areas became intolerable, Dr. Schoedinger would recommend anterior discectomy and instrumented interbody fusion. (Tr. 176)

On February 6, 2008, cardiologist Joseph A. Craft, M.D., recommended increased pacemaker outputs to stimulate left pectoral muscle after Plaintiff complained of left chest muscle cramping. Dr. Craft noted that the cramps could be a result of her motor vehicle accident. (Tr. 204)

A February 7, 2008 lumbar myelogram revealed ventral extradural defects at L2-3 and L4-5, which appeared central, and insensitive L5-S1. (Tr. 187) A cervical myelogram and CT performed on that same date showed disc protrusions at C3-6 and small ventral extradural defect at C4-5. (Tr. 188-89) A CT scan of the lumbar spine revealed disc protrusions at L5-1, L4-5, L2-3, and T11-12. (Tr. 192)

On February 8, 2008, Dr. Schoedinger refilled Plaintiff's Vicodin prescription. (Tr. 175) He also noted that Plaintiff was unable to work, and return to work was indefinite. (Tr. 200)

On March 24, 2008, Plaintiff reported continued neck and back pain. Physical exam revealed no sensory loss, motor weakness, pathologic reflex, or vascular insufficiency. Dr. Schoedinger recommended non-operative measures until she was unable to live with her difficulty. Because she had trouble taking various medications as a result of her Pace Maker, Dr. Schoedinger told her to continue using Vicodin sparingly. (Tr. 370)

Plaintiff reported persistent neck pain on June 10, 2008. She also complained of headaches and low back pain, which was less severe than her neck pain. She had no lower limb complaints but stated that her back and neck pain worsened when sitting for prolonged periods of time or when driving. Dr. Schoedinger noted decreased sensation to light touch over all autonomous sensory areas in both hands, most marked over the radial nerve distribution bilaterally. He opined that her symptoms were likely attributable to cervical disc pathology. He recommended that she pursue nonoperative measures until she was unable to live with her difficulty. She was fearful of the prospect of any invasive treatment. He advised Plaintiff to lose weight and prescribed Vicodin. (Tr. 371)

On August 14, 2008, Plaintiff reported continued neck and low back pain and tingling in both hands. Dr. Schoedinger noted decreased range of motion at the extremes of the cervical and lumbar spine and decreased sensation over all autonomous sensory areas in both hands. She had no other sensory change, motor weakness, pathologic reflex, or vascular insufficiency in either arm or leg. Dr. Schoedinger opined that her symptoms likely reflected radicular irritation arising from cervical and lumbar disc pathology. He again recommended non-operative measures until she was unable to live with her difficulty. He ordered physical therapy for a home exercise program which she should pursue regularly. (Tr. 372)

On September 10, 2008, Dr. Schoedinger penned a letter stating that objective evidence supported intervertebral disc abnormalities in both the cervical and lumbar spine. He opined that Plaintiff was disabled from gainful employment at that time. (Tr. 373)

On January 1, 2009, Rosalie Benz, APRN, FNP, noted cervical and lumbar tenderness, hypothyroidism, chronic fatigue and chronic joint and muscle pain. (Tr. 400) On March 20, 2009, Plaintiff reported no significant change in symptoms and stated that her hands went to sleep intermittently. Plaintiff reported no headache or central complaints. Physical examination was normal. Dr. Schoedinger recommended non-operative measures and advised Plaintiff to lose weight. (Tr. 363)

Plaintiff returned to Dr. Schoedinger on April 6, 2009, reporting that she was fearful of surgery despite persistent pain in her neck and low back. Dr. Schoedinger recommended two-level discectomy and fusion in the cervical and lumbar anterior. (Tr. 361)

On July 20, 2009, Plaintiff reported that her persistent neck and low back pain were intolerable, requiring further diagnostic workup. Dr. Schoedinger noted decreased sensation over

all autonomous sensory areas in hands and about the plantar surface of both feet. He ordered discography, as her neck pain was worse than her back pain. (Tr. 360) A July 28, 2009 discogram confirmed leaks at C4-5 and C5-6, with significant leak at C6-7. (Tr. 386-8)

On July 28, 2009, Dr. Schoedinger noted that a cervical discogram caused reproduction of Plaintiff's symptoms with injection at C6-7. He recommended surgery and informed Plaintiff that she must be tobacco-free for sixty days prior to surgery. (Tr. 359)

### IV. The ALJ's Determination

In a decision dated April 29, 2010, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010. She had not engaged in substantial gainful activity since August 17, 2007, her alleged onset date. Her severe impairments included degenerative disc disease of the cervical and lumbar spine, generalized anxiety, and depression. The ALJ found, however, that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 11-14)

After carefully considering the entire record, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work in that, with normal breaks, she could lift/carry ten pounds occasionally; stand/walk a total of two out of eight hours; and sit a total of six out of eight hours. However, Plaintiff needed to change positions for a few minutes every hour; could not climb ladders, ropes, or scaffolds; could occasionally stoop, crouch, crawl, and kneel; and could perform simple routine tasks that did not involve direct interaction with the general public. The ALJ noted Plaintiff's testimony and the medical evidence and found they did not support the severity of Plaintiff's allegations. (Tr. 14-22)

The ALJ determined that Plaintiff was unable to perform any past relevant work. However, in light of her younger age, GED, work experience, and RFC, the ALJ found that job existed in significant numbers in the national economy which Plaintiff could perform. These jobs included hand packer and production worker/assembler. The ALJ thus concluded that Plaintiff had not been under a disability, as defined by the Social Security Act, from August 17, 2007, through the date of the decision. (Tr. 22-23)

### V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a

reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robert v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[2] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak, 49 F.3d at 1354.

## VI. Discussion

In her Brief in Support of the Complaint, Plaintiff argues that substantial evidence does not support the ALJ's decision because the ALJ failed to fully and fairly develop the record, failed to consider the combination of all Plaintiff's severe medically determinable impairments, and failed to properly consider whether Plaintiff was justified in not following prescribed treatment. Defendant, on the other hand, contends that the ALJ properly developed the record and properly considered the combined effects of Plaintiff's impairments. Further, Defendant asserts that the ALJ did not deny benefits based on Plaintiff's failure to follow prescribed treatment. The undersigned finds that substantial evidence supports the ALJ's determination.

### A. Development of the Record

Plaintiff first argues that the ALJ failed to fully and fairly develop the record. Specifically, Plaintiff contends that Dr. Schoedinger indicated that Plaintiff was disabled and should remain off

---

[2]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

14

work indefinitely, yet the ALJ's decision is unclear regarding what medical evidence the ALJ relied on to conclude that Plaintiff was able to work. Defendant argues, however, that the ALJ did consider Dr. Schoedinger's opinion but noted that disability determinations are the responsibility of the ALJ and not the physician. "[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely 'opinions on the application of a statute, a task assigned solely to the discretion of the [Commissioner].'" Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) (quoting Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)). While the duty to develop the record is no longer required, when the ALJ issued his decision, the law required the ALJ to seek additional clarification where a crucial issue was underdeveloped. Id. See also 20 C.F.R. § 404.1520b (c) (2012) (giving the Commissioner discretion to recontact a treating physician where evidence is inconsistent or insufficient).

Here, the ALJ thoroughly assessed the treatment notes of Dr. Schoedinger, noting that the medical records and opinion letter indicated temporary and not permanent disability. (Tr. 17-20) Indeed, the medical records showed that Dr. Schoedinger recommended conservative treatment, weight loss, and exercise. (Tr. 363, 368, 370-72) Additionally, physical examinations revealed some decreased sensation in the hands, but no motor weakness, pathologic reflex, or vascular insufficiency in the upper or lower extremities. (Id.) On August 14, 2008, Dr. Schoedinger noted that Plaintiff's range of motion of the cervical and lumbar spine were decreased only at the extremes of motion and that upper extremity range of motion was complete at all joint levels. (Tr. 372)

15

"The regulations do not require an ALJ to recontact a treating physician whose opinion was inherently contradictory or unreliable. This is especially true when the ALJ is able to determine from the record whether the applicant is disabled." Hacker v. Barnhart, 459 F.3d 934, 938 (8th Cir. 2006) (citation omitted). The ALJ properly noted that the treatment records and objective medical evidence did not support Dr. Schoedinger's opinion, as recommendations for conservative treatment such as intermittent pain medication, physical therapy, and home exercises are inconsistent with a finding of long-term disability. See, e.g., Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (noting that physicians' reducing or ceasing medication, prescribing conservative treatment, and finding full range of motion and little loss of strength supported the ALJ"s determination that plaintiff's allegations of disability were not credible). The undersigned therefore finds that the ALJ was not obligated to recontact Dr. Schoedinger, as the ALJ fully and fairly developed the record.

### B. Combination of Plaintiff's Impairments

Next, the Plaintiff argues that the ALJ failed to consider the combination or all of her severe medically determinable impairments. Specifically, Plaintiff contends that at Step 2 of the sequential evaluation, the ALJ should have found the additional severe medically determinable impairments of symptoms from pacemaker placement and decreased sensation over all autonomous sensory areas in both hands. Defendant, on the other hand, asserts that the ALJ did consider and discuss all of Plaintiff's health conditions but properly determined that the pacemaker symptoms and decreased sensation in Plaintiff's hands were not severe. The Court agrees with the Defendant.

A severe impairment "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Basic work activities include physical functions; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervisors, co-workers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two." Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007) (citation omitted).

Here, the ALJ found at step two that Plaintiff's status post pacemaker implantation was not a severe impairment, either singly or in combination. In the decision, the ALJ noted Plantiff's pacemaker implantation surgery and the maintenance treatment with medication. (Tr. 16) Further, the ALJ pointed out that the cardiology test results after Plaintiff's accident were unremarkable and that the record contained no evidence that her motor vehicle accident was related to coronary matters. (Tr. 16) Indeed, the medical records contain little, if any, evidence that Plaintiff's pacemaker placement limited her ability to do basic work activities. Plaintiff reported that her SVT was controlled by medication and produced no side effects.[3] "An impairment which can be controlled by treatment or medication is not considered disabling." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (citation omitted). Further, Plaintiff did not

---

[3] Plaintiff briefly argues that the ALJ failed to consider that Plaintiff's pacemaker placement caused the inability to take narcotic pain medication. However, the record belies this claim. Dr. Schoedinger did prescribe Vicodin for pain. (Tr. 370-71) Plaintiff testified that muscle relaxants were potentially problematic with her pacemaker. However, she also testified that she took over-the-counter pain medication because she was afraid of becoming addicted to narcotic pain medication. (Tr. 34-35) Nothing in the record indicates that Plaintiff is precluded from taking narcotic pain medication due to her pacemaker.

17

complain of any heart-related symptoms to her treating physicians, other than chest pain related to acute bronchitis. (Tr. 272) Her cardiologist opined that left chest muscle pain was due to cramping after her car accident and not her pacemaker. (Tr. 204) The record also shows that Plaintiff is able to shop, cook, and perform household chores which demonstrates that Plaintiff's heart condition was not severe. See Johnston v. Apfel, 210 F.3d 870, 875 (8th Cir. 2000) (finding the inconsistencies between the plaintiff's subjective complaints, the medical record, and her daily activities supported the ALJ's determination that plaintiff's impairments were not severe). Thus, the undersigned finds that the ALJ's decision not to find Plaintiff's symptoms from her pacemaker severe at step two is supported by substantial evidence.

Plaintiff also argues that the ALJ should have considered the decreased sensation in Plaintiff's hands. The record demonstrates that the ALJ did consider Plaintiff's allegations of decreased hand sensation. (Tr. 16) However, the ALJ noted that Dr. Schoedinger's treatment notes did not have positive clinical neurological signs that would support a finding of disability. the treatment records show inconsistent neurological findings during evaluation. (Tr. 19) For instance, on March 24, 2008 and March 20, 2009, Plaintiff had no sensory loss in her hands. (Tr. 363, 370) She had some decreased sensation to light touch in both hands on January 10, 2008, June 10, 2008, and August 14, 2008, but no motor weakness. (Tr. 368, 371, 372) The ALJ has the duty to resolve conflicts in the evidence. Bowman v. Astrue, No. 1:11CV100 CDP, 2012 WL 4479083, at *7 (E.D. Mo. Sept. 28, 2012) (citation omitted). Here, in addition to normal neurological examinations showing no sensory loss, the ALJ also noted that Plaintiff was able to drive, use a computer, carry a laundry basket, pick up a dog, prepare meals, and perform household chores such as making beds and straightening up. (Tr. 20) Again, the record does not

support Plaintiff's contention that her decreased hand sensation limits her ability to do basic work activities, and the ALJ did not err in failing to find her this condition severe.

However, assuming. *arguendo*, that the ALJ should have considered Plaintiff's pacemaker placement and decreased hand sensation to be severe impairments, the Court finds any such error to be harmless. Thorough review of the ALJ's decision demonstrates that he considered all of her impairments, severe and non-severe, in determining her RFC. At step five, the ALJ considered Plaintiff's claims of problems related to her pacemaker implant, as well as reports of hand numbness. (Tr. 15-16) In light of the consideration and analysis of all of Plaintiff's combined impairments, the undersigned finds that any error in finding that her heart and hand problems constituted severe impairments was harmless. See e.g., Berry v. Astrue, No. 1:12-CV-6 RWS/SPM, 2013 WL 880075, at *11 (E.D. Mo. Feb. 13, 2013) (noting that failing to find an impairment severe at step two does not require reversal where the ALJ considers all of plaintiff's severe and non-severe impairments in the subsequent analysis); Givans v. Astrue, No. 4:10CV417 CDP, 2012 WL 1060123, at *17 (E.D. Mo. March 29, 2012) (noting that failure to find PTSD was a severe impairment was harmless error where the ALJ considered those symptoms in the RFC analysis).

### C. Consideration of Plaintiff's Justification in Not Following Prescribed Treatment

Last, the Plaintiff asserts that the ALJ erred in finding Plaintiff not disabled based on her failure to have surgery, which was recommended by her physician. Defendant maintains that the ALJ did not base his decision to deny benefits on Plaintiff's failure to follow prescribed treatment.

Plaintiff selectively chooses excerpts from the ALJ's opinion to attempt to show the disability denial was based either on Plaintiff's refusal to have surgery or on the ALJ's finding that

surgery was not required. However, arguable deficient opinion-writing does not require the Court to set aside an administrative finding where the deficiency has not bearing on the outcome of the case. Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008) (citations omitted).

Review of the entire opinion shows that the ALJ denied Plaintiff's disability claim based on the totality of the record, which indicated that Plaintiff had the RFC to perform a limited range of sedentary work. As stated above, the ALJ relied on the medical evidence, including diagnostic tests and treatment, and on Plaintiff's testimony and reported daily activities to reach his decision. Further, to determine Plaintiff's credibility, the ALJ may consider her willingness to submit to treatment and the type of treatment prescribed to determine the sincerity of her allegations. Gray v. Apfel, 192 F.3d 799, 804 (8th Cir. 1999) (citation omitted). In light of the medical evidence and other evidence in the record as a whole, substantial evidence supports the ALJ's credibility determination and conclusion that Plaintiff was not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**. A separate Judgment in accordance with this Memorandum and Order is entered this same date.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of September, 2013.